**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | (Previously Chapter 11) |
| | ) | |
| **PATTERSON INVENTORY, LLC, *et al.*,**[1] | ) | Case No. 25-90392 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

# CHAPTER 7 TRUSTEE OF THE FBG DEBTORS' OBJECTION TO EMERGENCY APPLICATION TO AUTHORIZE THE SPV DEBTORS' TRUSTEE TO SELL INVENTORY PURSUANT TO THE WIND DOWN ORDER

[Relates to Docket No. 99]

Eva S. Engelhart, the chapter 7 trustee (the "FBG Trustee")[2] of the jointly administered estates of First Brands Group, LLC and its affiliated debtors (the "FBG Debtors" and such estates, the "FBG Estates"), files this objection (the "Objection") to the *Emergency Application to Authorize the SPV Debtors' Trustee to Sell Inventory Pursuant to the Wind Down Order* [Docket No. 99] (the "Motion") filed by Ronald J. Sommers (the "SPV Trustee"), the chapter 7 trustee of Patterson Inventory, LLC, Patterson Inventory Holdings, LLC, Starlight Inventory I, LLC, and Starlight Inventory Holdings I, LLC (collectively, the "SPV Debtors" and such estates, the "SPV Estates"), and respectfully states as follows:

1 The debtors in these chapter 7 cases, along with the last four digits of each debtor's federal tax identification number, are: Patterson Inventory, LLC (2872) (Case No. 25-90392); Patterson Inventory Holdings, LLC (0079) (Case No. 25- 90393); Starlight Inventory I, LLC (6698) (Case No. 25-90394); and Starlight Inventory Holdings I, LLC (6472) (Case No. 25-90395). The Evolution SPV Debtors' mailing address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

2 Capitalized terms used herein but not otherwise defined have the meanings giving in the Motion and that certain *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* [Case No. 25-90399, Docket No. 2454] (the "Wind Down Order"), as applicable.

## PRELIMINARY STATEMENT

1. While the Court and parties-in-interest are well-accustomed to the value destructive litigation tactics of the SPV Trustee and Evolution,[3] this Motion is perhaps the most egregious yet. By the Motion the SPV Trustee asks this Court to (i) set aside key terms of its own Wind Down Order and Extension Order; (ii) ignore representations made to the Court by the SPV Trustee's counsel; and (iii) force the FBG Trustee to disregard her fiduciary duties and the best interests of stakeholders—including general unsecured creditors, administrative creditors, and the U.S. government—for the sole purpose of benefiting Evolution (if Evolution is determined to be the rightful lienholder).[4] The Court should deny the Motion for three reasons:

2. *First*, the Court should not expand the SPV Trustee's rights under the Wind Down Order and Extension Order at the expense of FBG Debtors' estates. The Motion does not show, and the SPV Trustee's own declarant does not even claim, that the inventory at issue has been under-marketed. To the contrary, the Motion concedes that "[w]ould-be purchasers have made several lucrative offers to Hilco" and the Overbeeke Declaration confirms that Hilco has identified buyers since the spring of 2026 and presented multiple transactions to the SPV Trustee. *See* Motion ¶ 6. The alleged defect the Motion identifies is not marketing at all; it is a dispute over who bears tariff liability on Wind Down Assets held in foreign trade zones. The FBG Trustee believes the choice is simple: either a buyer or the estates, but only if the estates can actually pay the tariffs. The SPV Trustee's Motion is premised on a faulty third option of questionable legality

---

[3] "<u>Evolution</u>" means, collectively, Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master L.P. (as successor in interest to Evolution Credit Partners Trade Finance L.P.), Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution affiliated funds.

[4] The FBG Trustee reserves all rights regarding the interests asserted by Evolution and the SPV Trustee.

where fiduciaries can simply saddle likely administratively insolvent estates[5] with additional administrative claims without regard for their future payment to pursue facially higher cash purchase prices for the sole benefit of secured creditors that in fact leave the estate worse off after factoring in remining liabilities. The FBG Trustee, in the exercise of her reasonable business judgment, declines to abdicate her fiduciary duties to all constituents in that manner.

3. *Second*, even if the SPV Trustee's proposal had legal or fiduciary merit (it does not), the Motion and Overbeeke Declaration fail to properly assess the bids received, as Hilco has. The FBG Debtors selected Hilco as consultant under the Wind Down Order due to its unimpeachable reputation in the field of asset monetization. Recognizing this expertise, the SPV Trustee *chose* to extend the Wind Down Order to the SPV Debtors' estates. Since entry of the Wind Down Order, including after entry of the Extension Order, Hilco's approach to evaluating bids has remained consistent. Hilco examines all bids received, including evaluating the price to be paid, liabilities to be assumed, and any other direct and indirect consideration received. Contemporaneously herewith, the FBG Trustee will file a motion in furtherance of the Wind Down Order to sell certain of the Wind Down Assets subject to the Motion. That sale (the "McHenry Wind Down Sale" and such assets, the "McHenry Wind Down Assets"), which enjoys the support of the Ad Hoc Group, ABL Secured Parties, and Onset, exemplifies why the status quo under the Wind Down Order is the best possible mechanism to maximize value. The McHenry Wind Down Sale has a value of potentially $47 million, comprising a cash purchase price of $12 million and the assumption of $13-35 million of potential tariff liability to U.S. Customs and Border Protection, which the buyer has agreed to assume and pay as and when due.

[5] *See* Hr'g Tr. 30:19-22 ("An additional reason this Court cannot confirm the plan, and it's not feasible based on the record, that the FBG Debtors will not be able to pay administrative creditors in full on the effective date."), 59:20-22 ("There are hundreds of millions of unpaid administrative expense claims. The Debtors have no operating businesses. They're administratively insolvent.") (Aug. 24, 2026).

4. *Third*, the SPV Trustee ignores the additional costs his half-baked proposal would cause, presumably because the SPV Trustee and Evolution expect the FBG Estates to bear such costs. The SPV Trustee has repeatedly cited the fact that the SPV Debtors are neither the leaseholder nor the importer of record to create an environment for evaluating bids where all the benefits of bids for the assets go to Evolution and all the burdens go to the FBG Estates. The FBG Estates funded Location Expenses at the locations holding the McHenry Wind Down Assets for thirteen months, with no contribution from the SVP Estates or Evolution, despite the FBG Debtors' request. They now propose to run a parallel marketing process, which will further delay the Wind Down Sales, increasing Location Expenses and professional fees. Moreover, the Motion's proposal that Hilco "shall not be entitled to any Inventory Fee" on sales completed by the SPV Trustee is in conflict with the Consulting Agreement this Court approved—and which the SPV Trustee agreed to under the Extension Order. The Consulting Agreement's "Survival of Services" provision entitles Hilco to its fee on sales to prospects Hilco identified and expressly survives termination. The practical result of the SPV Trustee's proposal is therefore not to save the estates a fee, it is to pay a consulting fee twice: once to the SPV Trustee's preferred consultant, and inevitably to Hilco as well, all out of sale proceeds whose ownership is disputed.

5. To be clear, the disagreement with the SPV Trustee has never been about not being kept in the process—the emails Mr. Overbeeke attaches to his Declaration show months of communication about potential sales. The disagreement is about structure, fiduciary duties, and how these two estates, borne from the same situation and the same pre-bankruptcy Company, can monetize assets for the collective good. The hard-fought, heavily negotiated Wind-Down Order answered that question elegantly. The Wind-Down Order employs a series of notices and consents to deal with the overlapping collateral issues. Those notices and consents have worked—over 60

Wind Down Sales have been consummated, which, with the inclusion of the McHenry Wind Down Sale, are estimated to gross approximately $100 million for the benefit of the estates due to Hilco's efforts on behalf of all stakeholders. These last few sales have stalled because Evolution wants more money—at the expense of all other stakeholders—so they are crying foul on process. The Court should see through that façade and bind Evolution to the same process as all other stakeholders, just as the SPV Trustee requested when he voluntarily sought to have it extended to the SPV Estates. Accordingly, for the reasons stated below, the FBG Trustee respectfully requests the Court deny the Motion.

## OBJECTION

### A. The Motion Seeks to Rewrite the Wind Down Order and Extension Order to Resolve a Tariff Dispute, Not a Marketing Problem.

6. The Wind Down Order approved the Consulting Agreement and made Hilco the "exclusive agent" with respect to, among other things, the Inventory Services, including the authority to "negotiate the terms of sales of the Inventory in whole or in part and implement any such agreements reached with purchasers." *See* Wind Down Order at 1; Consulting Agreement § III(A); Motion ¶¶ 2, 12. After the SPV Debtors' cases converted, the SPV Trustee sought and obtained the Extension Order, which extended "the authority granted to the [FBG Debtors] in the Wind Down Order" to the SPV Trustee and authorized him "to take all steps necessary to effectuate the transactions contemplated by the Wind Down Order." Docket No. 61 ¶¶ 2–3; *see also* Motion ¶ 14. The SPV Trustee thus *chose* to take the Wind Down Order as he found it, including Hilco's exclusivity and the notice and consent rights of the Wind Down Sale Notice Parties.

7. Having elected that framework, the SPV Trustee cannot now ask the Court to carve out a parallel sale authority for himself simply because the Wind Down Sale Notice Parties will not consent to the transaction structures Evolution prefers. For the avoidance of doubt, the FBG

Trustee expressly presented the SPV Trustee-Evolution structure to the Ad Hoc Group and the ABL Secured Parties, who blanketly rejected it due to the administrative expense burden it would add to the FBG Estates.

8. Nothing in the Motion suggests that the Wind Down Assets have been under-marketed. The Motion concedes that "[w]ould-be purchasers have made several lucrative offers to Hilco," and the SPV Trustee's own declarant confirms that "[s]ince the spring of 2026, Hilco . . . has identified potential buyers for the inventory in the Warehouses." Motion ¶ 6; Overbeeke Decl. ¶ 7. The Motion itself walks through three transactions that Hilco sourced and presented. *See* Motion ¶¶ 17–28. The exhibits to the Overbeeke Declaration reflect months of exchanges among Hilco, its joint venture partner, the Debtors' counsel, the SPV Trustee, Evolution's advisors, and Mr. Overbeeke regarding prospective buyers, deal terms, and transaction structures. *See generally* Overbeeke Decl., Exs. A–I. In short, Mr. Overbeeke's complaint that Hilco "has not told us . . . about their marketing process," Overbeeke Decl. ¶ 30, is contradicted by his own exhibits.

9. The Motion admits what the real issue is: "[p]otential deals have repeatedly stalled over the same issue: who bears the tariff liability on inventory held in the FTZs." Motion ¶ 17; *see also* Overbeeke Decl. ¶ 31. Granting the SPV Trustee a second, nonexclusive sale right would not resolve that issue, because any sale he negotiates would remain subject to the very same notice and consent rights under the Wind Down Order. *See* Motion ¶ 8; Proposed Order ¶ 3. The only thing the SPV Trustee's proposal would add is a second, uncoordinated marketing process for the same inventory that would serve to disrupt and delay the Hilco process.

10. What the SPV Trustee actually seeks is authority to pursue transactions that leave tariff liability behind with the estates. Mr. Overbeeke is candid on this point: he has, "along with

counsel for Evolution, proposed alternative sale structures which would, if approved, leave the tariff liability on one of the debtors' estates, rather than shifting it to the buyer." Overbeeke Decl. ¶ 9. That is the crux of the problem. Leaving a liability with an estate does not make the liability disappear. Any tariff liability left behind would be asserted against the BPI estate, as importer of record, by the U.S. government as an administrative claim. The FBG Estates (of which BPI is one) are already likely to be administratively insolvent. *See* Hr'g Tr. 30:19-22 ("An additional reason this Court cannot confirm the plan, and it's not feasible based on the record, that the FBG Debtors will not be able to pay administrative creditors in full on the effective date."), 59:20-22 ("There are hundreds of millions of unpaid administrative expense claims. The Debtors have no operating businesses. They're administratively insolvent.") (Aug. 24, 2026). The SPV Trustee therefore proposes to deepen that insolvency and run a second sale process on the backs of administrative creditors—here, primarily the U.S. government—for the benefit of a single alleged secured creditor, Evolution. See Overbeeke Decl., Exh. C.[6]

11. Mr. Overbeeke suggests that conversion of the FBG Debtors' cases to chapter 7 should somehow make it permissible to allow administrative claims to grow with no guarantee of payment. *See* Overbeeke Decl. ¶ 11. That is not the law. Conversion does not change an estate representative's fiduciary duty to consider all stakeholders when evaluating a sale under the business judgment standard. A chapter 7 trustee must "collect and reduce to money the property of the estate . . . as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). In doing so, a "trustee has a duty to maximize the value of the estate" and "may accept a lower bid in the presence of sound business reasons." *In re Moore*, 608 F.3d 253,

[6] *See also* E-Mail from Dan Kamensky, advisor to Evolution, to Cindi Giglio and others (Oct. 16, 2026) ("By contrast, if the sale is consummated through the Chapter 7 estates, the net proceeds would be expected to exceed $10 million, as the associated tariff liabilities would remain unpaid administrative claims at the Chapter 7 estates rather than being satisfied by the buyer from the sale proceeds.").

263 (5th Cir. 2010). This duty "does not require [the trustee] to mechanically accept a bid with the highest dollar amount" without regard to other considerations. *In re Mtn. States Rosen, LLC*, 619 B.R. 750, 755 (Bankr. D. Wyo. 2020). Indeed, courts in various jurisdictions will uphold a trustee's decision to sell assets at a lower bid amount when the facts and circumstances so justify. *See, e.g.*, *In re Broadmoor Place Investments, L.P.*, 994 F.2d 744 (Bankr. E.D.N.Y. 1998) (approving a lower monetary bid as the highest and best bid); *In re Oklahoma Forge, LLC*, 671 B.R. 297 (Bankr. N.D. Okla. 2025) (same); *In re Landscape Properties, Inc.*, 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988) ("in choosing which is the better offer when competing offers have been made, courts generally consider factors in addition to a higher dollar amount").

12. Assumption of liabilities, such as administrative claims, is properly included as bid consideration in determining whether the trustee has satisfied the business judgment standard. *See In re Old Cold LLC*, 879 F.3d 376, 380 (1st Cir. 2018) ("Its revised bid consisted of $750,000 in post-petition debt and the assumption of about $300,000 in pre-petition liabilities."); *In re Alaska Fishing Adventure, LLC*, 594 B.R. 883 (Bankr. D. Alaska 2018) (granting the trustee's motion to sell assets where there were two competing bids which provided different consideration, reasoning that the trustee accepted an offer that provided a larger benefit to the estate and its creditors overall because, among other reasons, the accepted offer "would result in the reduction of claims against the estate" in the amount of $125,112 while the competing offer would have left over $350,000 remaining in unsecured claims); *In re Nicole Energy Services, Inc.*, 385 B.R. 201 (Bankr. S.D. Ohio 2008) (including payment of administrative expenses as bid consideration since, absent the bid, the estate would have been responsible for such expenses); *In re Publishers Clearing House LLC*, No. 25-10694 (MG), 2025 WL 1805885 (Bankr. S.D.N.Y. June 30, 2025) (purchase price consisted of cash, cure costs, and assumption of certain prize winner liabilities). An estate

fiduciary should not allow legitimate claims, such as the tariff claims of the U.S. government, to go unpaid so that an alleged secured lender can receive more.

**B. Hilco Has Properly Evaluated Bids on a Total-Value Basis; the Overbeeke Declaration Does Not.**

13. Since entry of the Wind Down Order, and continuing after entry of the Extension Order, Hilco's approach to evaluating bids has remained consistent: Hilco examines any and all bids received, evaluating both the price to be paid and the liabilities to be assumed. The bids that have been rejected by Evolution each employed a construct whereby the buyer assumes tariff liability and pays a sum of cash. Those bids would have delivered real value to the estates by collecting cash and eliminating an administrative claim that in each case had the potential to be larger than the cash collected. Evolution's preferred structure doesn't enhance overall value it simply moves value from the U.S. government to the secured lenders.

14. The Overbeeke Declaration itself illustrates the flaw in the SPV Trustee's analysis. In paragraph 10, Mr. Overbeeke treats a bid of [redacted] in cash, plus [redacted] in cure costs, plus assumption of tariff liability he values at [redacted], as worth [redacted], because in his view (or, rather Evolution's view) *only* the cash proceeds of a transaction should be considered when evaluating a bid. *See* Overbeeke Decl. ¶ 10. Mr. Overbeeke proceeds in paragraph 17 to describe a purportedly improved bid of [redacted] from the same buyer as yielding [redacted] of value to the estates net of cure costs. *See id.* ¶ 17. The inconsistency is notable because both cure and tariffs are non-cash value in each bid. Mr. Overbeeke nets out the required cure (because he knows this will be paid directly from cash proceeds), but does not account for the tariff claims of the U.S. government because he believes that this Court will authorize a construct where a "better" bid is one that provides less total value to the estates so long as the cash component is higher. Mr. Overbeeke has not actually put forward a single bid that is higher and better, he is

simply shifting dollars from the U.S. government to the secured lenders—which the FBG Trustee (and the Chapter 11 Debtors before her) were not prepared to do.

15. It is likewise insincere for the SPV Trustee to suggest that Hilco has taken a myopic approach favoring a single estate or constituent, *see* Motion ¶¶ 15, 30, when the record shows that is precisely what Mr. Overbeeke proposes to do. The entire effort to displace Hilco is premised on Evolution attempting to strong-arm a result that ignores the interests of every constituent other than Evolution. The Court should not allow that result where a heavily negotiated Wind Down Order is in place and, in the case of the proposed McHenry Wind Down Sale, a willing buyer, following a robust marketing process, has offered a value-maximizing transaction that is supported by the Ad Hoc Group, ABL Secured Parties, and Onset.

**C. The Motion, Which Seeks to Collaterally Attack this Court's Wind Down Order, Would Increase Costs to the FBG Estates and Cannot Strip Hilco of Its Contractual Fee.**

16. The Motion ignores the additional costs its proposal would impose. The FBG Estates have funded Location Expenses at the properties containing the disputed inventory for thirteen months, without contribution from the SPV Estates or Evolution. The Motion acknowledges that "significant carrying costs" accrue while the inventory remains unsold. Motion ¶ 30. Yet the SPV Trustee proposes a parallel marketing process, conducted by additional consultants and attorneys, Proposed Order ¶ 4, that will further delay the Wind Down Sales, increase Location Expenses and professional fees, and invite buyers to play two sellers of the same inventory against each other.

17. The Motion also proposes that Hilco "shall not be entitled to any 'Inventory Fee'" or reimbursement of fees and expenses on sales completed by the SPV Trustee,[7] and that the 5% commission instead be paid to the SPV Estates. Proposed Order ¶ 5(a); *see also* Motion ¶ 16 n.10. That proposal conflicts with the Consulting Agreement this Court approved. The Consulting Agreement provides Hilco a commission of 5% of Net Proceeds from the sale of Inventory. Consulting Agreement § VI(A)(1). Its "Survival of Services" provision entitles Hilco to its fee on sales to prospects Hilco identified and expressly survives termination. *See* Consulting Agreement § IV.B. Mr. Overbeeke concedes that his work has largely consisted of analyzing buyers Hilco identified and communicating with Hilco's joint venture partner. *See* Motion ¶¶ 18, 23, 26; Overbeeke Decl. ¶ 7. In fact, Mr. Overbeeke added only one prospective buyer to Hilco's prospect list of 42. Therefore, it is a near-certainty that any sale of the inventory would be to a buyer on Hilco's prospect list.

18. Delaware law, which governs the Consulting Agreement, adheres to the objective theory of contracts, *i.e.*, "a contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectation inconsistent with the contract language." *Id.* at 368 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)). Delaware courts "uphold the freedom of contract and enforce as a matter

[7] For the avoidance of doubt, the FBG Trustee objects to the "completion" of the sale of any Wind Down Assets without her expressed written consent.

of *fundamental public policy* the voluntary agreements of sophisticated parties." *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 688–89 (Del. 2024) (emphasis in original).

19. Contract provisions requiring a company to pay a fee to its financial advisor or consultant upon consummation of a transaction that closes after the engagement ends (*i.e.*, during a "tail period"), where the sale is to a prospect previously identified by the advisor, are commonplace and regularly upheld. *See Cato Cap. LLC v. Hemispherx Biopharma Inc.*, 625 F. Appx 108, 111 (3d Cir. 2015) (analyzing fee tail provision and noting that had the consultant identified the transaction counterparty in a prospect list, the consultant would have been entitled to a fee for the tail period). Applying Delaware law, the Fifth Circuit affirmed a judgment awarding a financial advisor its full success fee on two financings, one of which closed during the twelve-month "Tail Period" following the agreement's termination, and rejected the company's attempts to narrow the agreement's defined terms. *Centerboard Sec., L.L.C. v. Benefuel, Inc.*, 730 F. Appx 179, 184 (5th Cir. 2018). The Consulting Agreement is a voluntary agreement among sophisticated parties, approved by this Court, and its terms are unambiguous. The SPV Trustee identifies no basis, under section 105(a), section 704(a)(1), or otherwise, to rewrite it. *See* Motion ¶ 11. The practical result of the SPV Trustee's proposal is therefore not to save the estates a fee; it is to pay a consulting fee twice: once to the SPV Trustee's preferred consultant and attorneys, and inevitably to Hilco as well, all out of proceeds whose ownership is disputed. Redirecting the 5% commission to the SPV Estates would compound the problem by awarding those estates a windfall from proceeds that the FBG Trustee maintains will ultimately belong to BPI and the FBG Estates.

20. A final infirmity with the Motion is that it inappropriately attempts to collaterally attack the Wind Down Order. If the SPV Trustee seeks relief with respect to the Wind Down

Order, it must do so pursuant to Federal Rule of Civil Procedure 60, made applicable by way of Federal Rule of Bankruptcy Procedure 9024. The Motion identifies no ground under Rule 60—be it mistake, inadvertence, surprise, excusable neglect, fraud, or newly discovered evidence—warranting relief from the Wind Down Order. Indeed, the evidence presented in the Motion support the conclusion that the FBG Trustee and Hilco have complied with their obligations under the Wind Down Order. And as courts make clear, relief from a judgment or order "will not be granted . . . merely because a party is unhappy," *In re Acorn Hotels*, 251 B.R. 696, 705 n.16 (Bankr. W.D. Tex. 2000), and "should be granted sparingly as an equitable remedy to prevent manifest injustice" and only where "extraordinary circumstances" exist. *In re Wylie*, 349 B.R. 204, 212 (B.A.P. 9th Cir. 2006).

**RESERVATION OF RIGHTS**

21. The FBG Trustee reserves all rights, claims, and defenses with respect to the Motion, the Wind Down Assets, ownership or lien disputes related to the Wind Down Assets, including the right to supplement this Objection and to present evidence and argument at any hearing on the Motion.

*[Remainder of page intentionally left blank]*

WHEREFORE, the FBG Trustee respectfully requests that the Court (i) deny the Motion; and (ii) grant such other and further relief as the Court deems just and proper.

Dated: October 18, 2026
New York, New York

*/s/ Cindi M. Giglio*
KATTEN MUCHIN ROSENMAN LLP
Cindi M. Giglio
Grace A. Thompson
50 Rockefeller Plaza
New York, New York 10020-1605
Telephone: (212) 940-8800
Email: cgiglio@katten.com
grace.thompson@katten.com

\- and -

Rachel M. Riley
2121 N. Pearl Street, Suite 1100
Dallas, Texas 75201
Telephone: (214) 765-3600
Email: rachel.riley@katten.com

*Proposed Special Counsel for the FBG Trustee*

**Certificate of Service**

I certify that on October 18, 2026 I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Cindi M. Giglio*
Cindi M. Giglio